IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

SCOTT J. BISHOP,
      Petitioner,

vs.                                 Case No.:  3:10cv234/RV/EMT

KENNETH S. TUCKER,[1]
      Respondent.
_____/

## ORDER and REPORT AND RECOMMENDATION

      This cause is before the court on Petitioner's petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (doc. 1).  Respondent filed an answer and relevant portions of the state court record (doc. 15).  Petitioner filed a reply (doc. 18).

      The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(b).  After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.       BACKGROUND AND PROCEDURAL HISTORY

      The relevant aspects of the procedural background of this case are established by the state court record (*see* doc. 15).[2]  Petitioner was charged in the Circuit Court in and for Escambia County, Florida, Case No. 2005-CF-000430, with one count of attempted first degree premeditated murder

---

[1] Kenneth S. Tucker succeeded Edwin G. Buss as Secretary for the Department of Corrections.  Secretary Tucker is automatically substituted as Respondent.  *See* Fed. R. Civ. P. 25(d)(1).

[2] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (doc. 15).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

(Count 1) and one count of burglary of a dwelling with assault or battery (Count 2) (Ex. C at 1). The offense conduct occurred on January 1, 2005 (*id.*). Following a jury trial on March 14–15, 2006, Petitioner was found guilty of attempted first degree murder with a weapon, and burglary of an occupied dwelling with assault or battery or while armed (Ex. C at 283; Ex. D). On June 29, 2006, Petitioner was adjudicated guilty and sentenced to concurrent terms of twenty-five (25) years of imprisonment, with pre-sentence credit of 545 days (Ex. C at 285–315, 328–34).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D06-4078 (Ex. C at 336, Ex. E). The First DCA affirmed the judgment per curiam without written opinion on December 12, 2007, with the mandate issuing December 28, 2007 (Exs. B, H). Bishop v. State, 969 So. 2d 1019 (Fla. 1st DCA 2007) (Table). Petitioner did not seek further review.

On January 17, 2008, Petitioner filed a motion for mitigation of sentence, pursuant to Rule 3.800(c) of the Florida Rules of Criminal Procedure (Ex. I). The state circuit court denied the motion in an order rendered January 29, 2008 (Ex. J).

On October 22, 2008, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. L at 134–53). The state circuit court appointed counsel for Petitioner and held a limited evidentiary hearing on three of Petitioner's claims (*id.* at 161–62, 171–229). The state circuit court subsequently denied the Rule 3.850 motion (*id.* at 231–40). Petitioner appealed the decision to the First DCA, Case No. 1D09-2944 (Ex. M). The First DCA affirmed the decision per curiam without written opinion on April 23, 2010, with the mandate issuing June 29, 2010 (Exs. O, P). Bishop v. State, 37 So. 3d 850 (Fla. 1st DCA 2010) (Table). The same day the mandate issued, Petitioner filed the instant federal habeas action (doc. 1).

II.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States. As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and

Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19.

In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[3]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

---

[3] Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case."  Neelley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* Parker v. Head, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'"  Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06).  The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06).  If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."  Williams, 529 U.S. at 409.  Whether a State court's decision was an unreasonable application of a legal principle must be assessed in light of the record the court had before it.  Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683

(2004) (per curiam); *cf.* Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001).  "In determining whether a state court's decision represents an unreasonable application of clearly established federal law, a federal court conducting habeas review 'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.'" Gill v. Mecusker, 633 F.3d 1272, 1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at 411) (citing Harrington v. Richter, — U.S. —, 131 S. Ct. 770, 786–87 (Jan. 19, 2011)).  The AEDPA's "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it.  *See* Gill, *supra* at 1291 (citing Harrington, 131 S. Ct. at 786).  Under § 2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. *See* Harrington, 131 S. Ct. at 786; *see also* Gill, *supra,* at 1292 (the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless

objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see e.g.* Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact."). The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See* Gill, 2010 WL 609844, at *18. A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision. *Id.*

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

III.    EXHAUSTION AND PROCEDURAL DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[4] thereby giving

---

[4]Section 2254 provides, in pertinent part:

(b)(1)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the

the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed. 2d 865 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim.  Duncan, 513 U.S. at 365–66; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); Picard, 404 U.S. at 277–78.

The Supreme Court has provided lower court with guidance for determining whether a habeas petitioner has met the "fair presentation" requirement.  In Picard v. Connor, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief.  404 U.S. at 277.  In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," id., 404 U.S. at 278, the Court rejected the contention in that case that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is not enough that a petitioner make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court.  Anderson v. Harless, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982).  In Anderson, the habeas petitioner was granted relief by the Sixth Circuit Court of Appeals on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt.  459 U.S. at 7 (citing Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)).  The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which

---

judgment of a State court shall not be granted unless it appears that–
      (A)  the applicant has exhausted the remedies available in the courts of the State; or
      (B) (i)  there is an absence of available State corrective process; or
          (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

"the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law." Anderson, 459 U.S. at 7 (internal quotation marks omitted). The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the cited case advanced a federal claim. Id., 459 U.S. at 7 and n.3. Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought. Id.

Years later, the Supreme Court readdressed the "fair presentation" requirement in Duncan v. Henry, 513 U.S. 364. The Duncan Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[5] The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court." Duncan, 513 U.S. at 365–66. More recently, the Supreme Court again focused upon the requirement of "fair presentation," holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." Baldwin v. Reese, 541 U.S. 27, 124 S. Ct. 1347, 1351, 158 L. Ed. 2d 64 (2004). In Baldwin, the Supreme Court recognized that "[a] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" Id., 541 U.S. at 32. This language, while not part of the Court's holding, provides helpful instruction. With regard to this language, the Eleventh Circuit explained in McNair v. Campbell, 416 F.3d 1291 (11th Cir. 2005):

---

[5] The petitioner in Duncan raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal. Presented with a state constitutional claim, the state court applied state law in resolving the appeal. 513 U.S. at 366.

If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion.  However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'"  McNair [v. Campbell], 315 F. Supp. 2d at 1184 (quoting Vasquez v. Hillery, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)).  This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302-03 (citations omitted).[6]

The Eleventh Circuit, prior to Duncan, had broadly interpreted the "fair presentation" requirement.  After Duncan, however, the Eleventh Circuit has taken a more narrow approach.  For example, in Zeigler v. Crosby, the court held that the habeas petitioner failed to "fairly present" his juror misconduct claims to the state courts where his brief to the state appellate court did not refer to the federal constitutional issues raised in his federal habeas petition, and none of the cases cited in his direct appeal discussed the United States Constitution.  345 F.3d 1300, 1307 (11th Cir. 2003).  The Eleventh Circuit specifically noted that the section of the petitioner's appellate brief which dealt with juror misconduct contained the words:  "Appellant was denied due process and a fair trial. . . .," which could be interpreted as asserting a fair trial claim under the Due Process Clause of the Florida Constitution.  Id. at 1308 n.5.  The only cases cited in the discussion of the issue in petitioner's state appellate brief were state supreme court cases that made no mention of the United States Constitution and cited no federal cases.  The court concluded that petitioner's "[c]ursory and conclusional sentence (unaccompanied by citations to federal law), . . . did not present to the Florida courts the federal claim asserted to us."  Id.

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, that is, procedurally

---

[6] In his initial brief before the Court of Criminal Appeals, McNair cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law."  McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005).  The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments.  Id.

barred from federal review.  *See* O'Sullivan, 526 U.S. at 839–40, 848; Bailey v. Nagle, 172 F.3d 1299, 1302–03 (11th Cir. 1999).  This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default.  *See* Coleman v. Thompson, 501 U.S. 722, 734–35 and n.1, 111 S. Ct. 2546, 2555 and n.1, 115 L. Ed. 2d 640 (1991); Caniff v. Moore, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); Chambers v. Thompson, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord* Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993); Parker v. Dugger, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991).  In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine. Bailey, 172 F.3d at 1303.  In the second instance, a federal court must determine whether the state's procedural default ruling rested on adequate state grounds independent of the federal question.  *See* Harris v. Reed, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989).  The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question.  Lee v. Kemna, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed. 2d 820 (2002).  The adequacy requirement has been interpreted to mean that the rule must be "firmly established and regularly followed," Siebert v. Allen, 455 F.3d 1269, 1271 (11th Cir. 2006), that is, not applied in an "arbitrary or unprecedented fashion," Judd v. Haley, 250 F.3d 1308,1313 (11th Cir. 2001), or in a manifestly unfair manner.  Ford v. Georgia, 498 U.S. 411, 424–25, 111 S. Ct. 850, 858, 112 L. Ed. 2d 935 (1991); Upshaw v. Singletary, 70 F.3d 576, 579 (11th Cir. 1995).

The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision.  Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001).  First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.[7]  Second, the state

---

[7] The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits.  Marek v. Singletary, 62 F.3d 1295, 1302 (11th Cir. 1995); Alderman v. Zant, 22 F.3d 1541 (11th Cir. 1994).

court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law.  Third, the state procedural rule must be adequate.  *Id.*  The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion.  *Id.*

To overcome a procedural default such that the federal habeas court may consider the merits of a claim, the petitioner must show cause and prejudice or a fundamental miscarriage of justice.  Tower, 7 F.3d at 210; Parker, 876 F.2d 1470.  "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim."  McCleskey v. Zant, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986)).  Lack of counsel or ignorance of available procedures is not enough to establish cause.  Tower, 7 F.3d at 210.  To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995).  "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him."  Schlup, 513 U.S. at 327.  Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare.  To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

*Id.*

Within this framework, the court will review Petitioner's claims.

IV.   PETITIONER'S CLAIMS

A.   Ground One: "Trial counsel was ineffective for failing to suppress the statements of the Petitioner when those statements were not voluntarily made, in violation of the Petitioner's Fifth, Sixth, and Fourteenth Amendment rights under the United States Constitution."

Petitioner contends defense counsel performed ineffectively by failing to seek suppression of Petitioner's statements to Deputies Laura Ann Montoya and Terry Lee Kilgore (doc. 1 at 3). Petitioner asserts Mr. Jonathan Jackson implicated him in the crimes, which caused deputies to come

to his mother's home (Petitioner was seventeen years old at the time) (*id.*).  He states deputies spoke to his mother but did not tell her that Petitioner was being arrested or that charges may be filed against him (*id.* at 3–4).  Petitioner states the deputies arrested him and escorted him to the Sheriff's Office (*id.*).  He states his mother explicitly told him not to speak to the deputies, but the deputies separated him from his mother and elicited a statement from him despite her warning (*id.*).  Petitioner states the deputies had been advised that hours before the interview, he had a seizure, and he told the deputies he wanted to sleep (*id.* at 4).  He states the deputies were also aware that he had been previously diagnosed as schizophrenic and had been involuntarily committed to a mental hospital due to self-threats and suicidal tendencies (*id.*).  He asserts he was only "semi-coherent" during the interview with the deputies and in no condition to provide a voluntary statement (*id.*).  Petitioner asserts his educational level rendered him unable to understand the Miranda[8] warnings he was given (*id.*).  He states he signed a written confession, but it was written by the deputies because he told them he could not read or write (*id.*).  Petitioner asserts the deputies engaged in suggestive interview techniques, and the written confession contained inaccuracies (*id.*).  For example, deputies told Petitioner that a dumbbell was used to beat the 14-year old victim, but Petitioner told them he used a hammer, and the confession stated only an object was used (*id.*).  Petitioner asserts the combination of his age, mental state, physical state, educational level, and separation from his mother rendered his statement involuntary; and counsel should have filed a motion to suppress on these grounds (*id.*).  He contends there is a likely probability the statement would have been suppressed if counsel had filed a motion (*id.* at 5).

Respondent contends Petitioner failed to demonstrate that the state court's adjudication of the claim was based upon an unreasonable determination of the facts, or was contrary to or an unreasonable application of clearly established federal law (doc. 15 at 18–24).

1.      Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668 (1984).  To obtain relief under Strickland, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's

---

[8] Miranda v. Arizona, 384 U.S. 436 (1966).

deficient performance, the result of the proceeding would have been different. *Id.* at 687–88. If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688–89. "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." Jones, 436 F.3d at 1293 (citing Chandler, 218 F.3d at 1314–15 n.15). Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994). Counsel's performance is deficient only if it is "outside the wide range of professional competence." Jones, 436 F.3d at 1293 (citing Strickland, 466 U.S. at 690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation"). "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." Michael v. Crosby, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting Chandler, 218 F.3d at 1317). Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting Putman v. Head, 268 F.3d 1223, 1244 (11th Cir. 2001)).

As to the prejudice prong of the Strickland standard, Petitioner's burden of demonstrating prejudice is high. *See* Wellington v. Moore, 314 F.3d 1256, 1260 (11th Cir. 2002). The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Id.* (quoting Strickland, 466 U.S. at 693).

However, the Court has also clarified that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome.  <u>Strickland</u>, 466 U.S. at 693–94.  Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

<u>Id.</u> at 694.  Indeed, it would be "contrary to" the law clearly established in <u>Strickland</u> for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence.  <u>Williams v. Taylor</u>, 529 U.S. at 405–06.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. <u>Strickland</u>, 466 U.S. at 694–95.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  <u>Id.</u> at 695.  Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), <u>Strickland</u> prejudice is gauged against the outcome of the trial, not on appeal.  <u>See</u> <u>Purvis v. Crosby</u>, 451 F.3d 734, 739 (11th Cir. 2006) (citing <u>Strickland</u>, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact.  <u>Strickland</u>, 466 U.S. at 698; <u>Collier v. Turpin</u>, 177 F.3d 1184, 1197 (11th Cir. 1999).

        2.      Federal Review of State Court Decision

Petitioner raised this claim as Ground One in his Rule 3.850 motion (Ex. L at 136–39).  The state circuit court identified the <u>Strickland</u> standard as the appropriate legal standard for reviewing Petitioner's claims (<u>id.</u> at 232–33).  The court denied Ground One on the following grounds:

> [A]t the evidentiary hearing, Defendant testified that he had discussed with Mr. Lang, his trial counsel, the possibility of filing a motion to suppress the recorded statement.[FN 4, reference to evidentiary hearing transcript]  Defendant further testified that Mr. Lang explained to him that "the jury needed to see it so they could

see the corruption in it . . . he wanted it in."[FN 5, reference to evidentiary hearing transcript]

Mr. Lang testified at the evidentiary hearing that the videotaped statement was to Defendant's benefit.[FN 6, reference to evidentiary hearing transcript] Mr. Lang further testified that the video explained Defendant's position:  "He described in detail the fact that he did not recall what happened.  In fact, in the video itself, which was lengthy, he denied being involved or remembering anything approximately seventeen times before he ultimately at the very end, said I did it."[FN 7, reference to evidentiary hearing transcript]  Moreover, Mr. Lang testified that his experience indicated to him that a motion to suppress the video would not have been successful, and that he made a strategic decision not to file a motion to suppress because he thought the video might be more helpful than harmful.[FN 8, reference to evidentiary hearing transcript in which Mr. Lang testified he had been an attorney for 35 years]

Defendant has not overcome the Court's requisite strong presumption that counsel made a reasonable strategic decision, based on his professional judgment, not to make a motion to suppress the videotape.  Defendant concedes that his counsel discussed the possibility of suppression with him, and explained why it would not have been advantageous to file such a motion.  Therefore, the Court finds that counsel was not deficient for failing to file a motion to suppress the video, after considering the situation and making a strategic decision.  Defendant is not entitled to relief on this claim.

(Ex. L at 234–35).

Petitioner's post-conviction appellate counsel argued this issue on appeal of the circuit court's decision (Ex. M at 13–20).  The First DCA affirmed without written opinion (Ex. O).

 "The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact, and a state court's decision concerning that issue is presumptively correct."  Provenzano v. Singletary, 148 F.3d 1327, 1330 (11th Cir. 1998).  However, "the question of whether the strategic or tactical decision is reasonable enough to fall within the wide range of professional competence is an issue of law not one of fact."  Id.

Petitioner has not proffered any evidence to rebut the state court's factual finding that Mr. Lang's failure to file a motion to suppress was a tactical decision.  Further, the finding is well-supported by the record.  At the evidentiary hearing on Petitioner's Rule 3.850 motion, Mr. Lang testified he viewed the videotaped confession as soon as he discovered its existence (Ex. L at 198).

He testified he reviewed it with Petitioner's family and then reviewed it with Petitioner (*id.*).  Mr. Lang testified he became aware of Petitioner's mental health issues early in the case by reading an evaluation performed by Dr. Larson, a licensed psychologist, to determine Petitioner's competency to proceed and his sanity at the time of the offense (*id.*).  Mr. Lang testified Petitioner had been evaluated by Dr. Larson prior to his (Lang's) involvement in the case (*id.* at 198–99).  Mr. Lang testified he also obtained detailed information from Petitioner's mother (*id.* at 199).  Mr. Lang testified Petitioner told him he had consumed a lot of cocaine the night before his statement to police and had blacked out (*id.* at 200).  He testified he did not file a motion to suppress the videotape, because the videotape was beneficial to the defense:

> A [Mr. Lang].  [T]he video, in my opinion, actually was to his benefit.
>
> He described in detail the fact that he did not recall what happened. (inaudible)  In fact, in the video itself, which was lengthy, he denied being involved or remembering anything approximately seventeen times before he ultimately, at the very end, said, I did it.
>
> So, that recanting of doing what he's accused of, in my opinion, helped him more than hurt him.  And the—you know, whether or not it had been—it was legally sufficient to file a motion to suppress [sic].  You know, I had some doubts about that, quite frankly.  But, in any event, the video, I felt and talking with Scott, Mr. Bishop, about that actually was to his benefit.
>
> Q [by Petitioner's counsel].  Okay.  So that was your opinion that you wanted it in.
>
> A.  Yes, ma'am.
> . . . .
> We [Petitioner and Mr. Lang] did talk about the tape a lot because it was paramount that there was such an abundance of evidence other than the tape that—that way, at least by the jury being able to hear the tape, would explain his position to a great extent and the fact that he didn't recall doing anything.
>
> Of course, at that time, he didn't remember whether or not he did anything or not.  So it wasn't a situation I didn't do it, I don't recall if I did it.
>
> Q.  Okay.  And do you remember just parenthetically when he actually got his memory back about what happened that night?

A.  It was shortly before the trial.  And I—again, it's been a long time, so I don't recall exactly.  But it may have been—we took at least one deposition of Mr. Jackson, maybe more.  And it may have been some time during the course of those depositions that his memory came back to the extent that he felt that he recalled Mr. Jackson actually plummeting [sic] the girl, the victim, with the barbell.

Q.  Now, do you recall doing any research regarding a motion to suppress in this case?

A.  I looked into the fact of whether or not his mother was notified, which my understanding was she doesn't have to be present or in the room.  She evidently acquiesced [ ] in the fact that he was talking to law enforcement because she was home when they came and picked him up.

I looked into the fact of whether or not he had voluntary [sic] waived his rights at the beginning of the statement, which is on the tape that he did.  He acknowledged them.  He initialed them.  So the fact that these things were done would tend to tell me that there was—is not a basis for a motion to suppress.

Then, we get into the issue of whether or not he is mentally capable of making a decision as to whether or not he can waive his rights and that was—we already had the evaluation with Dr. Larson, at that point, indicating that he was competent and the only issue of competency by Dr. Larson was the fact that he may not be able to cooperate with counsel in preparation for a defense in that he couldn't remember what happened or didn't know what happened.  But he was determined to be—you know, insanity was not a [sic] issue, so—

Q.  Did—the night of the interrogation, he clearly—regarding the confession, he clearly did remember what happened or made some sort of statement.  Did you consider maybe that if you have a doctor's opinion showing that he doesn't remember anything that that statement was likely not intelligent, voluntary, those sort of things.

A.  Well, I believe and, of course, I haven't seen his statement in a long time.  But my recollection of the statement was, basically, that he didn't remember what happened.  In fact, and to the very end of the statement is when he indicated that he had some involvement in it.  But, after that point, there was very little detail that came out.

(Ex. L at 197–204).

On cross-examination, Mr. Lang reiterated his opinion that (1) a motion to suppress would not have been successful, (2) the videotaped statement was more helpful than harmful to the defense,

and (3) his decision not to pursue suppression of the statement was a matter of trial strategy (Ex. L at 210–11).  Lang testified that Petitioner did not remember the events of January 1, 2005, until shortly before trial, after Jonathan Jackson stated in a deposition that Petitioner beat the victim (*id.* at 202–03).  Lang testified he advised Petitioner not to testify at trial, because his testimony would not have been plausible due to Petitioner's professed lack of memory and then sudden recollection that Mr. Jackson beat the victim immediately after Mr. Jackson pointed the finger at Petitioner (*id.* at 205–07, 211–12).  Additionally, Lang testified, Petitioner's testimony that Mr. Jackson beat the victim was not supported by the evidence (*id.*).[9]  Mr. Lang testified he told Petitioner that in his opinion, everything Petitioner could testify to at trial was brought out in the videotaped statement, including, he did not commit the crimes (and stated so seventeen times), he did not recollect committing the crimes, and he suffered from schizophrenia and other mental issues (which rendered him vulnerable to the deputies' very suggestive interview techniques); therefore, the jury would hear these facts without Petitioner subjecting himself to cross-examination by the prosecutor (*id.* at 205–06).

Petitioner testified during the evidentiary hearing that he initially did not remember what happened the night of the crimes, but his memory began to return after several months (Ex. L at 185–86).  He stated if he had testified at trial, he would have testified that he entered the dwelling of Mr. Jonathan May through a window and let Jonathan Jackson in through the front door (*id.* at 185, 188).  Petitioner stated he would have testified he went into one room, and Mr. Jackson went into another (*id.* at 188).  He would have testified he then went into the room where Mr. Jackson was and saw "what was going on" and grabbed Mr. Jackson and pulled him back (*id.*).

Dr. Larson's evaluation was admitted into evidence at the evidentiary hearing (*see* Ex. L at 214, 308–18).  Dr. Larson concluded Petitioner was competent to proceed in all matters except his capacity to provide defense counsel pertinent information, due to Petitioner's claims of amnesia during the time frame of the crimes (*id.* at 315–16).  As to Petitioner's sanity at the time of the offenses, Dr. Larson concluded Petitioner did not meet the criteria for insanity (*id.* at 316).

---

[9] At trial, Steven Fay testified Petitioner told him he thought he killed a girl named Jordan (Ex. D at 135–39).  William Jewel testified Petitioner told him he did something "very bad," and he could go to jail for the rest of his life for it (*id.* at 166–68).

In light of the record, it was reasonable for the state court to conclude that Mr. Lang's reasons for not seeking suppression of Petitioner's statement were sound.  By allowing the jury to see and hear the videotape (a transcript of which is included in the trial transcript (*see* Ex. D at 205–80)), the defense was able to argue that Petitioner consistently denied he beat the girl and consistently stated he did not recall the events of the night before, but due to his age, compromised mental and physical state, suggestive interrogation techniques, and other factors, he allowed investigators to convince him he committed the crimes (*id.* at 352–67).  Additionally, the defense was able to argue that Mr. Jackson beat the girl, by presenting testimony from witnesses that the victim gave inconsistent statements as to who beat her, Mr. Jackson admitted to non-law-enforcement persons that he beat her, and Mr. Jackson intimidated witnesses to "keep their mouths shut" (*id.* at 295–327).  Therefore, the defense was able to argue that Mr. Jackson beat the girl, and Petitioner's confession was completely unreliable, without the jury hearing Petitioner's arguably implausible testimony that he suddenly remembered that Mr. Jackson beat the girl, and without subjecting Petitioner to cross-examination by the prosecutor.  Petitioner has not shown that no reasonable lawyer, presented with the same circumstances as Mr. Lang, would have made the same tactical decision.  Therefore, he failed to show that the state court's adjudication of the claim was unreasonable.

Based upon the foregoing, Petitioner has failed to show that the state court's adjudication of his claim was based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of Strickland.  Therefore, he is not entitled to habeas relief on Ground One.

B.      Ground Two:  "Trial counsel was ineffective for failing to obtain an expert witness, in violation of the Petitioner's Fifth, Sixth, and Fourteenth Amendment rights to the United States Constitution."

Ground Three:  "Trial counsel was ineffective for failing to present reverse *Williams* rule evidence, in violation of the Petitioner's Fifth, Sixth, and Fourteenth Amendment rights to the United States Constitution

In Ground Two, Petitioner contends defense counsel performed deficiently by failing to obtain an expert witness to testify at a suppression hearing and at trial that Petitioner suffered from schizophrenia and had suffered a recent seizure that rendered him incapable of providing a voluntary statement to police (doc. 1 at 5–6).  Petitioner argues if counsel had obtained an expert, there is a

reasonable probability the trial court would have suppressed Petitioner's statement to police, and the trial would have resulted in an acquittal (*id.* at 6).

In Ground Three, Petitioner contends defense counsel was ineffective for failing to present prior bad act evidence regarding one of the State's trial witnesses, Mr. Jonathan Jackson (doc. 1 at 6). He alleges defense counsel should have offered evidence of Mr. Jackson's prior arrests and convictions, which showed he had previously been arrested, tried, and convicted of violent offenses, including assault with a deadly weapon and battery with great bodily harm, and sent to a juvenile program for violent acts (*id.*). He further alleges counsel should have offered evidence showing that throughout Mr. Jackson's life, he had committed unwarranted acts of violence, including violence toward female family members, for the sole reason of watching others suffer (*id.*). Petitioner asserts counsel also should have offered evidence of Mr. Jackson's mental health history, including that he was bi-polar and unmedicated, and had previously been involuntarily committed to a mental hospital (*id.* at 7). Petitioner contends this evidence would have established that Mr. Jackson, not Petitioner, committed the crimes (*id.* at 6–7). He argues if counsel had offered this evidence, there is a likely probability the jury would have acquitted him of the charges (*id.* at 7).

Respondent asserts Petitioner failed to properly exhaust these claims (doc. 15 at 24–27). Respondent states Petitioner raised both claims in his Rule 3.850 motion, but he failed to argue either claim in his initial brief on appeal of the denial of his Rule 3.850 motion. Therefore, he waived appellate review of the claim and, by doing so, failed to properly present them to the state court (*id.*). Respondent further contends Petitioner can no longer return to state court to litigate the claims; therefore, the claims are procedurally barred from federal review (*id.* at 27). Respondent additionally argues notwithstanding the exhaustion issue, Petitioner failed to demonstrate that the state court's adjudication of the claims was contrary to or an unreasonable application of clearly established federal law (*id.* at 27–28).

In Petitioner's reply, he contends he was not required to brief either of these issues in his post-conviction appeal, because neither of them were the subject of the limited evidentiary hearing in the state circuit court, and the circuit court summarily denied these claims (doc. 18 at 3–4, 6). He additionally contends the state court's adjudication of the claims was based upon an unreasonable determination of the facts, because the circuit court made evidentiary findings without holding an

evidentiary hearing on either claim (*id.* at 4–6).  Petitioner also argues the state post-conviction court denied him due process by failing to hold an evidentiary hearing on these claims (*id.* at 5–6).

Respondent's procedural default argument is supported by the record and state and federal law.  Petitioner raised both of the instant claims as Grounds Two and Three in his Rule 3.850 motion (Ex. L at 139–44).  The state circuit court held an evidentiary hearing on three of Petitioner's six claims (not either of the instant claims) and subsequently denied relief on all of them (*id.* at 161–62, 173–228, 231–40).  The state circuit court disposed of the instant claims as follows:

> Defendant claims that had trial counsel called an expert to testify regarding Defendant's mental illness, that testimony would have demonstrated that Defendant's confession was involuntary and should have been suppressed.
>
> As discussed in "Ground One," *supra*, trial counsel was not deficient for failing to seek the suppression of the videotaped statement.  Therefore, expert testimony regarding Defendant's mental illness in order to prove that the statement was involuntary was unnecessary.  Furthermore, the Court, not an expert witness, would have made the determination whether the statement was voluntary, contrary to Defendant's assertions.  Allowing the videotape to be published to the jury was a reasonable strategic decision; hence, counsel was not deficient for failing to call an expert to testify in an effort to suppress the videotape.  Defendant is not entitled to relief on this claim.
>
> . . . .
>
> Specifically [in Ground Three], Defendant claims that trial counsel should have presented to the jury Mr. Jackson's criminal record and other past "unwarranted acts of violence."  Defendant further claims that evidence of Mr. Jackson's history of abusing females should have been presented due to similarities to the instant offense.
>
> "Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is ***inadmissible when the evidence is relevant solely to prove bad character or propensity.***"  Section 90.404(2)(a), Florida Statutes.  "Reverse Williams rule" evidence is evidence of a crime committed by another person that a defendant offers to show his or her innocence of the instant crime.  See McDuffie v. State, 970 So. 2d 312, 324 (Fla. 2007).  The defendant must demonstrate a "close similarity of facts, a unique or 'fingerprint' type of information" for the reverse Williams rule evidence to be admissible.  See White v. State, 817 So. 2d 799, 806 (Fla. 2002), quoting State v. Savino, 567 So. 2d 892, 894 (Fla. 1990).  If a defendant's purpose is to shift suspicion from himself to another person, then

evidence of past criminal conduct of that other person should be of such nature that it would be admissible if that person were on trial for the present offense.  In other words, uncharged offenses and juvenile adjudications would not be admissible.  See Murphy v. State, 930 So. 2d 794, 796 (Fla. 1st DCA 2006); see also section 90.610(1)(b), Florida Statutes.

Mr. Jackson stated in his deposition that his date of birth was September 9, 1987, indicating that he was 17-years-old, a juvenile at the time of the offense.[FN 10, reference to deposition transcript]  Mr. Jackson's criminal record may not have been admissible because any criminal history would have likely been juvenile adjudications.[FN 11, reference to deposition transcript in which Mr. Jackson stated he had one felony conviction as a juvenile, had completed a six-month program and probation, and had no adult adjudications.]  Moreover, other "unwarranted acts of violence" would have been inadmissible solely to demonstrate a propensity for violence.  Even if a past incident of violence against a female had been otherwise admissible, Defendant has not demonstrated the requisite similarity between, for example, Mr. Jackson beating his mother as Defendant alleges, and Mr. Jackson randomly attacking the victim in this case, for such evidence to qualify as "reverse Williams rule evidence."[FN 12, noting the victim was a sleeping fourteen-year-old girl, who was beaten severely with a barbell during a burglary.]

Counsel was not deficient for failing to present "reverse Williams rule evidence" because the evidence would not likely have been admissible.  Even if the evidence had been admissible, Defendant was not prejudiced by the lack of this evidence at his trial because it is not probable that the outcome of the proceedings would have been different had counsel presented this evidence, due to the overwhelming evidence against Defendant, including his own confession.

(Ex. L at 235–37).

In Petitioner's brief on appeal of the decision, Petitioner's counsel argued only the issues litigated at the evidentiary hearing, that is, Grounds One, Four, and Five asserted in the Rule 3.850 motion (Ex. M).  Petitioner's counsel made no argument as to the issues raised in Grounds Two and Three (id.).  The State declined to file an answer brief unless the appellate court found reason to reverse the lower court's decision on a specific issue and sought the State's position on that issue (Ex. N).  The First DCA affirmed the lower court's decision without written opinion (Ex. O).

The Florida Rules of Appellate procedure provide that in a case where a movant's Rule 3.850 motion is denied after an evidentiary hearing, a movant wishing to appeal the denial of his motion must file an initial brief.  See Fla. R. App. P. 9.141(b)(3); see also Pennington v. State, 34 So. 3d

151, 152 n.1 (Fla. 1st DCA 2010) (briefing is required in appeal from non-summary denial of Rule 3.850 motion).  It is well established in Florida courts that claims for which an appellant has not presented any argument, or for which he provides only conclusory argument, are insufficiently presented for appellate review and are waived.  *See* Gamble v. State, 877 So. 2d 706 (Fla. 2004); Reed v. State, 875 So. 2d 415 (Fla. 2004); Cooper v. State, 856 So. 2d 969, 977 n.7 (Fla. 2003); Marshall v. State, 854 So. 2d 1235, 1252 (Fla. 2003) Sweet v. State, 810 So. 2d 854, 870 (Fla. 2002); Johnson v. State, 769 So. 2d 990, 1005–06 (Fla. 2000); Shere v. State, 742 So. 2d 215, 217 n.6 (Fla. 1999); Duest v. Dugger, 555 So. 2d 849, 852 (Fla. 1990) ("Merely making reference to arguments below without further elucidation does not suffice to preserve issues, and these claims are deemed to have been waived.").  Florida courts consistently apply this rule, even in cases where a post-conviction evidentiary hearing is limited in scope to some but not all post-conviction claims; thus, a movant wishing to preserve any claims for appellate review, whether summarily denied or not, must present argument on those issues in his initial brief.[10]  *See* Alcorn v. State, — So. 3d —, 2011 WL 2200625, at *1 (Fla. 4th DCA June 8, 2011) (where trial court disposed of four of five claims without evidentiary hearing and held evidentiary hearing on one claim, appellant's failure to argue one of his summarily denied claims in his initial brief constituted abandonment of claim); Prince v. State, 40 So. 3d 11 (Fla. 4th DCA 2010); Hammond v. State, 34 So. 3d 58 (Fla. 4th DCA 2010) (claim for which appellant did not present argument, or for which he provided only conclusory argument, was insufficiently presented for appellate review, regardless of whether claim was among those claims litigated at evidentiary hearing or among those claims summarily denied by trial court); Williams v. State, 24 So. 3d 1252 (Fla. 1st DCA 2009) (where appellant received evidentiary hearing on some of his post-conviction claims and others were summarily denied, appellate court would review only those summarily denied claims which movant argued in appellate brief); *see also* Ward v. State, 19 So. 3d 1060, 1061 (Fla. 5th DCA 2009) (en banc) (where all of appellant's post-conviction claims were summarily denied, but appellant chose to file initial brief

---

[10] Even if the Florida appellate courts were not absolutely consistent in applying this rule, such is not required to permit a federal court to conclude that a state procedural rule is adequate for federal habeas purposes.  *See* Maples v. Allen, 586 F.3d 879, 888 (11th Cir. 2009) (while "regularly followed" means "closely hewn to," it does not mean complete unanimity or absolute consistency of state decisions applying the rule) (citations omitted).

on appeal (even though not required to do so under Fla R. App. P. 9.141(b)(2)), appellant abandoned any issues not addressed in initial brief); Watson v. State, 975 So. 2d 572 (Fla. 1st DCA 2008) (same); Austin v. State, 968 So. 2d 1049 (Fla. 5th DCA 2007) (same)).

The undersigned concludes that the Florida procedural rule deeming as waived or abandoned those claims for which an appellant has not presented any argument in his initial brief, even when the post-conviction evidentiary hearing was limited in scope to some but not all post-conviction claims and the appellant's insufficiently presented claims were summarily denied by the trial court, is a firmly established and regularly followed procedural rule for purposes of federal habeas.  *See, e.g.*, Daniels v. Tucker, No. 5:09cv328/RS/EMT, 2011 WL 7153921, at *18 (N.D. Fla. Nov. 22, 2011), *Report and Recommendation adopted*, 2012 WL 379590 (N.D. Fla. Feb. 3, 2012) (unpublished); Stoudmire v. Tucker, No. 3:09cv48/MCR/EMT, 2011 WL 5426239, at *9–11 (N.D. Fla. Aug. 30, 2011), *Report and Recommendation adopted*, 2011 WL 5442091 (N.D. Fla. Nov. 9, 2011) (unpublished); Green v. McNeil, No. 1:09cv204/MMP/GRJ, 2011 WL 2790167, at *7 (N.D. Fla. June 22, 2011) (unpublished), *Report and Recommendation adopted*, 2011 WL 2790180 (N.D. Fla. July 15, 2011); Curry v. Buss, No. 3:08cv539/LAC/EMT, 2011 WL 2174038 (N.D. Fla. Apr. 26, 2011) (unpublished), *Report and Recommendation adopted*, 2011 WL 2149544 (N.D. Fla. June 1, 2011); Rasley  v. Buss, No. 5:08cv368/RH/EMT, 2011 WL 2358650  (N.D. Fla. Apr. 11, 2011) (unpublished), *Report and Recommendation adopted*, 2011 WL 2293383 (N.D. Fla. June 9, 2011); Ross v. McNeil, 5:07cv219/RS/EMT, 2010 WL 2179039 (N.D. Fla. Apr. 14, 2010) (unpublished), *Report and Recommendation adopted*, 2010 WL 2179037 (N.D. Fla. May 28, 2010) (unpublished), *cert. of appealability denied*, No. 10-13013-A (11th Cir. Oct. 4, 2010) (certificate of appealability sought on issue of whether Florida's procedural rule, that defendant waived or abandoned appellate review of post-conviction claims that were summarily denied and not addressed in defendant's appellate brief, where trial court held evidentiary hearing on other claims, was firmly established and regularly followed).[11]  Therefore, Petitioner procedurally defaulted Grounds Two and Three.

---

[11] The undersigned cites Daniels, Stoudmire, Green, Curry, Rasley, and Ross only as persuasive authority and recognizes that the opinions are not considered binding precedent.

Petitioner does not allege cause for the procedural default; nor does he allege he is entitled to review of his claims through any recognized exception to the procedural bar.  Therefore, Grounds Two and Three are procedurally barred from federal review.

Moreover, to the extent Petitioner presents a due process challenge to the state circuit court's failure to hold an evidentiary hearing on Grounds Two and Three, federal relief is unavailable.  The Eleventh Circuit has repeatedly held that defects in state collateral proceedings do not provide a basis for habeas relief.  *See* Carroll v. Secretary, DOC, 574 F.3d 1354, 1365 (11th Cir. 2009); Anderson v. Sec'y for Dep't of Corr., 462 F.3d 1319, 1330 (11th Cir. 2006) (per curiam); Quince v. Crosby, 360 F.3d 1259, 1262 (11th Cir. 2004); Spradley v. Dugger, 825 F.2d 1566, 1568 (11th Cir. 1987) (per curiam).  The reasoning behind this well-established principle is straightforward: a challenge to a state collateral proceeding does not undermine the legality of the detention or imprisonment—that is, the conviction itself—and thus habeas relief is not an appropriate remedy. *See* Carroll, 574 at 1365; Quince, 360 F.3d at 1261–62; Spradley, 825 F.2d at 1568.  Furthermore, such challenges often involve claims under state law, for example, Florida Rule of Criminal Procedure 3.850, which governs the availability of, and procedures attendant to, post-conviction proceedings in Florida; and a state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved.  *See* Carroll, 574 F.3d at 1365 (quoting McCullough v. Singletary, 967 F.2d 530, 535 (11th Cir. 1992)). Therefore, to the extent Petitioner claims that the state court violated his due process rights by summarily denying the claims without an evidentiary hearing, he is not entitled to relief.  *Id.*

C.      Grounds Four, Five, and Six

Petitioner abandoned Grounds Four, Five, and Six (doc. 18 at 6).

D.      Ground Seven: "Petitioner was denied his right to remain silent as guaranteed under the Fifth Amendment of the United States Constitution and *Miranda v. Arizona*."

Petitioner contends the trial court violated his constitutional right against self-incrimination by admitting testimony of Kim Wilson, a juvenile intake assessment screener at Lakeview Center, regarding Petitioner's statements to her during a post-arrest assessment of Petitioner's level of risk before he was incarcerated and the level of supervision he required while incarcerated (doc. 1 at 11–12).  Petitioner asserts defense counsel objected to admission of Ms. Wilson's testimony on the

ground that the assessment constituted a custodial interrogation, and Petitioner was not given a Miranda warning prior to the assessment (*id.*).  However, the trial court ruled that Ms. Wilson's testimony as to Petitioner's statements was admissible (*id.*).

Respondent contends Petitioner failed to demonstrate that the state court's adjudication of the claim was based upon an unreasonable determination of the facts, or was contrary to or an unreasonable application of clearly established federal law (doc. 15 at 35–51).

       1.      Clearly Established Federal Law

The Fifth Amendment provides that no "person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. art V.  In Miranda v. Arizona, the Supreme Court concluded that "without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."  384 U.S. 436, 467, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).  Accordingly, the Court formulated the now-familiar "procedural safeguards effective to secure the privilege against self-incrimination."  *Id.* at 444.  Among these is the rule that an individual held for interrogation must first be informed in clear and unequivocal terms that he has the right to remain silent.  *Id.* at 467–69.  The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court.  *Id.* at 469.  Additionally, the individual must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation.  *Id.* at 469–71.

With regard to the issue of whether particular police conduct constitutes "interrogation," in Miranda, the Supreme Court suggested that "interrogation" referred only to actual "questioning initiated by law enforcement officers."  384 U.S. at 444.  However, the Supreme Court clarified this statement in Rhode Island v. Innis, 446 U.S. 291, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980).  In Innis, the Court concluded that the goals of the Miranda safeguards could be effectuated if those safeguards extended not only to express questioning, but also to "its functional equivalent."  466 U.S. at 301.  The Court explained the phrase "functional equivalent" of interrogation as including "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from

the suspect." *Id.* (footnotes omitted). Finally, the Court noted that "[t]he latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Id.*

The Supreme Court subsequently applied these principles in Arizona v. Mauro, 481 U.S. 520, 107 S. Ct. 1931, 95 L. Ed. 2d 458 (1987). In Mauro, police officers gave Mauro the warnings required by Miranda, and Mauro indicated he did not wish to be questioned without a lawyer present. 481 U.S. at 520, 527. All questioning ceased, and Mauro was placed in the police captain's office because there was no secure detention area. *Id.* at 520. Mauro's wife was questioned in another room and then insisted she be allowed to speak with Mauro. *Id.* Although reluctant at first, the police allowed the meeting in the office on the condition that an officer be present. *Id.* Using a recorder placed in plain sight, the officer taped a brief conversation, during which Mauro told his wife not to answer questions until a lawyer was present, and he also made incriminating statements. *Id.* The Supreme Court held there was no interrogation, because (1) the officer who was present did not ask Petitioner any questions about the crime or his conduct, (2) the officer's decision to allow Mauro's wife to see him was not the kind of psychological ploy that properly could be treated as the functional equivalent of interrogation, and (3) viewing the circumstances from Mauro's perspective, it was doubtful that a suspect, told by officers that his wife would be allowed to speak to him, would feel that he was being coerced to incriminate himself in any way. *Id.* at 527–28.[12]

In Pennsylvania v. Muniz, the Supreme Court recognized a "routine booking question" exception to the protections of Miranda, which exempts from Miranda's coverage questions to secure the "biographical data necessary to complete booking or pretrial services." 496 U.S. 582, 601–02, 110 S. Ct. 2638, 110 L. Ed. 2d 528 (1990). The Court held that although questions regarding a suspect's name, address, height, weight, eye color, date of birth, and current age may qualify as custodial interrogation, such questions fell outside the protections of Miranda, because they were reasonably related to the police's administrative concerns. *Id.* The Court recognized,

---

[12] Innis and Mauro dealt with a violation of the Sixth Amendment right to counsel, rather than the Fifth Amendment right against self-incrimination involved in this case. However, because the issue of whether interrogation occurred is similar under both the Fifth and Sixth Amendment, these cases are helpful in defining the nature of the interrogation issue. *See* Endress v. Dugger, 880 F.2d 1244, 1249 (11th Cir. 1989).

however, that not every question asked during the booking process fell within this exception; without obtaining a waiver of the suspect's <u>Miranda</u> rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions.  *Id.* at 602 n.14.

        2.       Federal Review of State Court Decision

During trial, the court held a hearing on the admissibility of Ms. Kim Wilson's testimony (Ex. D at 176–93).  Ms. Wilson testified she was an intake assessment screener at Lakeview Center (*id.* at 177).  She testified an officer from the Department of Juvenile Justice brought Petitioner to her office on January 2, 2005, to conduct a post-arrest, pre-incarceration assessment of Petitioner's level of risk and the level of supervision he required (*id.* at 177, 179).  She testified as part of her assessment, she asked Petitioner why he was there (at the Department of Juvenile Justice), and Petitioner responded he had hit someone in the head (*id.*).  Ms. Wilson then asked Petitioner, "What are you talking about?" and he responded he was at a friend's house, she woke up and caught him, and he had to hit her because she caught him (*id.* at 179, 180–81).  Ms. Wilson testified she asked Petitioner what he hit the friend with, and he responded he hit her with "a lead weight, like a weightlifting weight" (*id.* at 180–81).  Ms. Wilson testified Petitioner was in custody when she assessed him (*id.*).  It was undisputed that Ms. Wilson's assessment occurred at 3:00 a.m. on January 2, 2005 (*see id.* at 191–92).

To place Ms. Wilson's assessment in relevant context, Investigator Kilgore of the Escambia County Sheriff's Office testified that on January 1, 2005, at 10:15 p.m. in an interview room at the Sheriff's Office, he advised Petitioner of his <u>Miranda</u> rights, and Petitioner agreed to talk to him and signed a written waiver of his rights (Ex. D at 201–02).  The interview lasted approximately 1 hour and 56 minutes, so it ended just after midnight on January 2, 2005 (*id.* at 204).  The interview concluded with Petitioner's signing a written statement, and Investigator Kilgore advising Petitioner he would complete paperwork, fingerprint Petitioner, and take him to the juvenile detention center (*id.* at 277–79).  Additionally, Petitioner admits that the officer who escorted him to Ms. Wilson's office was not actually in the office at the time of the assessment, but "around the open door" (doc. 1 at 11).

Defense counsel argued the assessment constituted a custodial interrogation, because Petitioner was in custody, Ms. Wilson was a person of authority, and Petitioner was taken into her office and expected to provide her with information (Ex. D at 181–84).  Defense counsel further argued that Ms. Wilson or the escorting officer was required to re-advise Petitioner of his Miranda rights prior to Ms. Wilson's interview, because the interview occured a day after Petitioner was advised of and waived his rights, and the interview was conducted by a different individual in a separate setting than the interrogation by Investigator Kilgore at the Sheriff's Office (id.).  The prosecutor argued the assessment was not an interrogation for Miranda purposes, and even if it was an interrogation, Petitioner had been advised of his Miranda rights the night before and voluntarily waived them, and "fresh" Miranda warnings were not required  (id.).  In support of his argument, the prosecutor cited Davis v. State, 698 So. 2d 1182 (Fla. 1997) and Garner v. State, 729 So. 2d 990 (Fla. 5th DCA 1999) (id. at 190–91).  The trial court ruled the testimony was admissible based upon the cases cited by the prosecutor and the prosecutor's arguments (id. at 193).[13]

---

[13] In Davis v. State, the defendant sought to suppress four statements to law enforcement, three of which were made on March 18 and the other on May 26.  698 So. 2d at 1186–88.  The appellate court held the first statement on March 18 was admissible because Davis was not in custody when he made it.  Id. at 1188.  The court held the second statement on March 18 was inadmissible because Petitioner was in custody (in a detention cell), and although the officer to whom he made incriminating statements did not "interrogate" Davis, Davis made the incriminating statements without ever being given a full Miranda warning.  Id. at 1188–89.  Notwithstanding, the appellate court held the erroneous admission of the statement was harmless, because shortly after the statement, Davis gave a taped statement in which he voluntarily gave the same information contained in his prior statement.  Id.  The court held the third (taped) statement on March 18 was admissible because Petitioner was given a full Miranda warning before the statement and waived his rights.  Id. at 1189.  As to the May 26 statement, the appellate court held that the statement was admissible even though Davis was not given a fresh set of Miranda warnings, because the statement was given voluntarily, as evidenced by the absence of evidence of coercion, the fact that Davis initiated the contact that led to the statement, and the fact that Davis was at least apprised of his right to counsel.  Id.

In Garner v. State, the defendant sought to suppress statements he made to a state employee, specifically, a child protection investigator with the Department of Children and Family Services, who visited the defendant in jail to question him about his plans for his young son, since the child's mother was dead, and the defendant was in jail.  729 So. 2d at 992.  The defendant admitted to the investigator that he killed his ex-wife, the child's mother.  Id.  The appellate court upheld the trial court's determination that the statement was not subject to suppression, because the investigator (1) was not a law enforcement officer, (2) was not working as an agent for law enforcement, (3) had not talked to the police prior to the interview, and (4) had not been asked by the police to see the defendant and elicit any information regarding the crime.  Id.  The appellate court also upheld the trial court's finding that the defendant volunteered the statement to the investigator, and it was not given in response to questioning.  Id.

On direct appeal, Petitioner argued the trial court erred in finding his statements to Ms. Wilson voluntary and admissible (Ex. E).  The First DCA affirmed the judgment per curiam without written opinion.

As previously discussed, the AEDPA's "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it.  *See* <u>Gill</u>, 633 F.3d at 1291 (citing <u>Harrington</u>, 131 S. Ct. at 786).  Under § 2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court.  *See* <u>Harrington</u>, 131 S. Ct. at 786; *see also* <u>Gill</u>, 633 F.3d at 1292 (the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

The state court's decision could have been based upon the argument that Ms. Wilson's questioning was not the functional equivalent of interrogation.  Ms. Wilson was not a law enforcement officer, and there is no evidence she was working as an agent for law enforcement in an investigative or evidence-gathering capacity.  Further, like the situation in <u>Mauro</u>, there is no evidence that Ms. Wilson talked to law enforcement prior to the interview, other than perhaps to schedule the required assessment, nor is there any evidence she had been asked by law enforcement to elicit information regarding the crime, or that officers arranged the assessment to elicit an incriminating response from Petitioner.  Further, viewing the circumstances from Petitioner's perspective, it is doubtful that a suspect in Petitioner's position would feel that he was being coerced to incriminate himself in any way.  Therefore, the state court could have reasonably concluded Petitioner's statements were voluntary and not elicited through interrogation or its functional equivalent.  *See* <u>Endress v. Dugger</u>, 880 F.2d 1244, 1249–50 (11th Cir. 1989).

The state court's decision also could have been based upon the argument that Ms. Wilson's questioning fell within the "routine booking exception."  The purpose of her questions was to assess

Petitioner's level or risk and the level of supervision he required while incarcerated since he was a juvenile. Further, her questions were reasonably related to this purpose. The state court thus could have concluded Ms. Wilson's questions were normally attendant to Petitioner's arrest and custody and necessary to complete the booking process at the juvenile detention facility. *See* <u>United States v. Doe</u>, 661 F.3d 550, 567 (11th Cir. 2011) (probation officer's request for biographical information in preparing pre-trial services report fell within well-established "routine booking exception" to <u>Miranda</u>'s coverage for questions posed to defendant to secure the biographical data necessary to complete booking or pretrial services) (citing <u>Muniz</u>, 496 U.S. at 601); *see also* <u>United States v. Sweeting</u>, 933 F.2d 962, 965 (11th Cir. 1991) ("An officer's request for routine information for booking purposes is not an interrogation under <u>Miranda</u>, even though that information turns out to be incriminating.") (internal quotation marks omitted); <u>United States v. Jackson</u>, 886 F.2d 838, 841 n. 4 (7th Cir. 1989) (finding that "the fifth amendment was not implicated" by custodial statements made to probation officer, because a probation officer is not someone who "acts on behalf of the prosecution").

Additionally, the state court's decision could have been based upon the argument that even if Ms. Wilson's questioning constituted interrogation and did not fall under the "routine booking exception," her failure to re-advise Petitioner of his <u>Miranda</u> rights did not render his statements to her inadmissible. The Eleventh Circuit has held that where a defendant was fully advised of his <u>Miranda</u> rights and waived them, he does not need to be given <u>Miranda</u> warnings prior to a subsequent interrogation conducted the same day if, given the totality of the circumstances, the waiver was knowing, intelligent, and voluntary. *See* <u>Ballard v. Johnson</u>, 821 F.2d 568, 571–72 (11th Cir. 1987) (where defendant properly executed waiver of <u>Miranda</u> rights during first interrogation, and subsequent interrogation occurred later on the same day, with the only break in questioning occurring when defendant was transported approximately twenty miles from one location to another, no violation of <u>Miranda</u> occurred by officer's failure to re-advise defendant of <u>Miranda</u> rights prior to subsequent interrogation); <u>Jarrell v. Balkcom</u>, 735 F.2d 1242, 1254 (11th Cir. 1984) (no violation of defendant's rights by failure to re-issue <u>Miranda</u> warnings at time of defendant's arrest, where Investigator Bishop gave defendant <u>Miranda</u> warnings at city hall prior to arrest; defendant indicated

he understood <u>Miranda</u> warnings; defendant was transported from city hall to police headquarters, where he was interviewed by Sergeant Blannott; prior to Blannott's interview, Blannott asked Bishop in defendant's presence whether defendant had received <u>Miranda</u> warnings; defendant was driven from police headquarters to prosecutor's office for polygraph examination; defendant was then driven back to police headquarters and arrested by Sergeant Blannott; and defendant was interrogated for 30–45 minutes by Blannott before confessing); *see also* <u>Martin v. Wainwright</u>, 770 F.2d 918, 930–31 (11th Cir. 1985), *modified in unrelated part*, 781 F.2d 185 (11th Cir. 1986) (suspect who was fully advised of <u>Miranda</u> rights and intelligently waived them, did not need to be given the complete <u>Miranda</u> warnings prior to a subsequent interrogation conducted seven days later).

In the instant case, Petitioner does not dispute that Investigator Kilgore advised him of his <u>Miranda</u> rights on January 1, 2005, at 10:00 p.m., nor does he dispute he executed a written waiver of those rights.  Further, he did not challenge the voluntariness of this waiver in the state courts. Additionally, there is no dispute that Ms. Wilson's intake assessment was conducted only five hours after Kilgore's interview commenced and three hours after it concluded.  In such circumstances, the state court could have determined that Ms. Wilson was not required to re-advise Petitioner of his <u>Miranda</u> rights.  Further, there is no allegation, or evidence suggesting, that Petitioner requested a lawyer or otherwise invoked his right to counsel at any time he was in police custody, or that he asked that either interview be terminated.  Based upon these circumstances, the state court could have concluded that Petitioner knowingly and voluntarily waived his <u>Miranda</u> rights a few hours before Ms. Wilson's assessment and did not need to be given his <u>Miranda</u> rights prior to Ms. Wilson's assessment.  It is possible that fairminded jurists could disagree that the state court's adjudication of the claim was erroneous; however, such disagreement only demonstrates that while the state court's adjudication of the claim may have been incorrect, it was not unreasonable.

Finally, even if the state court unreasonably applied <u>Miranda</u> and its progeny, Petitioner is not entitled to federal habeas relief.  In <u>Brecht v. Abrahamson</u>, the Supreme Court held that the harmless error standard set forth in <u>Kotteakos v. United States</u>, 328 U.S. 750, 66 S. Ct. 239, 90 L. Ed. 1557 (1946), applies in determining whether habeas relief must be granted because of

constitutional error of the trial type.  507 U.S. 619, 637–38, 113 S. Ct. 1710, 1722, 123 L. Ed. 2d 353 (1993).  The <u>Kotteakos</u> standard is whether, in light of the record as a whole, the trial court error had a "substantial and injurious effect or influence in determining the jury's verdict."  *Id.* (quoting <u>Kotteakos</u>, 328 U.S. at 776).

In the instant case, the jury was presented with Petitioner's videotaped confession to Investigator Kilgore that he "went over there and went in the house and walked around for a minute, seen [sic] her, and she was laying [sic] there, she didn't wake up, and I hit her with something, and that was it." (Ex. D at 269).  The jury also heard Petitioner tell Kilgore he "hit her and climbed back out the window and left" with "Jonathan," and admitted telling Jonathan what happened (*id.* at 270). The jury heard Jonathan Jackson's testimony that when Petitioner approached his (Jackson's) car after being in the house, Petitioner threw an object into the water and stated, "I think I killed a female." (*id.* at 90–93).  Mr. Jackson also testified Petitioner told him the female was asleep on the bed, and he hit her five or six times with a weight (*id.* at 94).  Mr. Jackson further testified that Petitioner told him he entered the house through a window, and the object he threw into the water was the weight (*id.* at 96).  The jury also heard Steven Fay's testimony that Petitioner told him he thought he killed a girl named Jordan (the victim's name) (*id.* at 135–39).  In light of this evidence, Ms. Wilson's testimony that Petitioner stated he was at a friend's house, she woke up and caught him, he had to hit her because she caught him, and he hit her with a weight, was merely cumulative. Therefore, the undersigned concludes the admission of Ms. Wilson's testimony did not have a substantial and injurious effect or influence in determining the jury's verdict.  Accordingly, Petitioner is not entitled to habeas relief on Ground Seven.

## V.     CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is **ORDERED**:

The clerk of court is directed to change the docket to reflect that Kenneth S. Tucker is substituted for Edwin G. Buss as Respondent.

And it is respectfully **RECOMMENDED**:

1.      That the petition for writ of habeas corpus (doc. 1) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 18th day of April 2012.


/s/ Elizabeth M. Timothy
**ELIZABETH M.  TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**